## Bigley *et al. versus* Williams.

1. In an action against the owners of a steamer for injury to barges from collision, the plaintiff having shown the collision and injury, may, in chief, give evidence that defendant's pilot was incompetent.

2. Anything evidencing negligence in those navigating the steamer or incompetency in the discharge of their duties which would tend, though remotely, to produce the accident, would be relevant.

3. The barges were floating down the river, guided by oars only; the steamer was ascending and under the control of the pilot; the steamer was bound to keep clear of the barges.

4. The plaintiff would have made a primâ facie case, by showing the collision, injury, and—the accident occurring at night—the exhibition of such lights as were necessary to warn the steamer.

5. The plaintiff was not bound to rest his case upon the presumption of carelessness arising from the circumstances, but might prove in chief positive negligence.

6. The plaintiff was bound, under the Act of Congress and common prudence, to show a light when it would avail the steamer to avoid a collision; that this was neglected during the remainder of the night when the steamer was not in sight, was of no importance to the defendants.

7. Evidence that the pilot, "after the accident, admitted the collision was caused by his neglect, and within twenty-four hours afterwards committed suicide by poison," was inadmissible.

8. Declarations of the pilot, unless made before or at the time of the collision and so connected with it as to make them part of the *res gestæ*, were inadmissible.

9. The narrative of an agent of a past occurrence, is not evidence against his principal.

10. The nearness to the accident of the subsequent declarations of an agent does not qualify them as evidence, unless they are so immediately connected as to form parts of its history.

11. Fawcett *v.* Bigley, 9 P. F. Smith 411, followed.

November — 1875.   Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas, No. 2, of *Allegheny county:* No. 90, to October and November Term 1875.

This was an action on the case, brought to January Term 1873, of the court below, by D. B. Williams, against John Bigley and others, owners of the steamboat "R. J. Grace."

The plaintiff was the owner of three barges laden with coal, lashed together and floating down the Ohio river on the night of October 30th 1872 ; the steamer "R. J. Grace" was ascending the river with a tow of several loaded flats ; at a point about four-

teen miles below Pittsburg a collision occurred between the two crafts by which one of the plaintiff's barges was sunk and lost. The plaintiff, alleging that this loss was occasioned by the negligence of the servants of defendants in. managing their steamboat, brought this action to recover compensation for their loss.

The case was tried September 15th 1874, before White J.

The plaintiff testified that the accident occurred about 7½ o'clock in the evening; about dark he had lighted the lamps and set them down until he was directed by the pilot to hold them up, when the " Grace " came in sight; they were then a mile and a half or two miles apart; plaintiff had signal lights; one was a big fire in a shanty which was built on the coal; he did not have what was called a steamboat fixed light; the shanty fire would be a fixed light equal to a steamboat furnace. The plaintiff testified as to the manner in which the lantern was exposed. He also testified that it was not customary to keep signal lights out all the time; they are exhibited only in case of danger; they are exhibited only when a steamboat is seen; he did not know that it was customary to keep fixed signal lights on floating crafts at night; did not know that the Acts of Congress required it.

Captain J. McDonald testified that he was a steamboat pilot and had known William Marshall, who was the pilot of the " Grace" at the time of the accident.

Plaintiff then proposed to prove by the witness that he was well acquainted with William Marshall, the pilot at the wheel of the " Grace" at the time of the collision, and that said Marshall had before his death for some time been in the employ of witness, and boating and piloting with him, and that for the last three or four years he, said Marshal, by reason of age, physical debility and impaired eye-sight, had become incompetent to steer, pilot or control a tow-boat or tow. This, for the purpose of showing that defendants had not on duty at the time of the collision a competent officer as pilot, and that this was a cause of the accident or contributed to it.

The defendants objected to the offer as incompetent and irrelevant; the offer was admitted and a bill of exceptions sealed for the defendants.

The witness testified in accordance with the offer.

Under a similar offer, objection and exception, C. Bobo, a pilot, testified in the same way as the previous witness as to the incompetency of Marshall as a pilot.

It was proposed to prove by plaintiff and other witnesses, that William Marshall, the pilot in charge of the " R. J. Grace " at the time of the collision, after the accident, admitted that the collision was caused by his neglect, and went within twenty-four hours afterwards, as soon as he got his boat into port, and committed suicide by poison. This, for the purpose of showing negligence on

part of defendants' agent, the pilot at the wheel of the "Grace" at the time of the collision.

This was objected to by defendants' counsel as incompetent and irrelevant.

The court said: "The offer is a little obscure, but, as I understand it, it is to prove the admissions of the pilot at the time of the accident or immediately after it. Such admissions or declarations will be received. The fact that he committed suicide afterwards, within twenty-four hours from the time of the accident, may be proven in connection with his admissions above referred to. Objections overruled, and a bill of exceptions sealed for defendants."

Williams then testified: "I went on board the 'R. J. Grace' that night, when she was landing the two barges that had got adrift from the third one. She was towing them at the time I went on her. It may have been half an hour after the collision. The first word spoken to me by Billy was, 'Danny, those boats don't belong to you.' I told him they did. 'Well,' said he, 'I did not see you in time. I thought it was——' and then he stopped. Some person touched him. He first said that he had not seen them in time, and then, just right after he says, 'I thought it was ——' and then he stopped. There was nothing came up between us after that. I did not see him afterwards. They left us and came with the balance of their tow to Pittsburg. Marshall poisoned himself the next night."

The plaintiff proposed to prove by N. W. Aultman, and other competent Ohio river pilots, that it is not the rule or custom, in navigating that river with floating boats, to keep up all night a stationary signal-light, but that the lights are exhibited only when steamboats or other vessels are approaching.

This was objected to by defendants:—

1. As incompetent and irrelevant.

2. That it is the duty of craft, such as the plaintiff's, when floating on the current at night, to keep one or more fixed and steady lights in one or more conspicuous parts of the boat.

The offer was admitted, and a bill of exceptions sealed for the defendants.

The witness testified: "I am a pilot. Have been at the business about nineteen years. About nine years steamboating, and the balance flat-boating. I floated on boats about fourteen or fifteen years, I suppose. I never knew a permanent signal to be carried on flat-boats. We used at first when I went on to have a tin lantern and candle. After that we got glass lanterns with oil. We kept them burning all night. We kept them some place where it would be handy to get when steamboats were approaching. When we were not meeting a steamboat we kept them in some place out of sight. * * * When the light was shown I made it a rule for the party holding it to hide it from me so that it would

[Bigley *v.* Williams.]

not blind me. I had him stand between it and me. I never knew of any stationary lights on floating boats."

Other witnesses testified as to the mode of exhibiting signal-lights on the float on the night of the accident; that at the time plaintiff exhibited the lantern on the float, the steamboat was distant about a quarter of a mile.

The defendants gave evidence that Marshall was an experienced pilot, had been engaged in the business for many years and had a high reputation in his business.

They gave evidence also that no lights were exhibited from the plaintiff's float until about three minutes before the accident, and when it was too late for the "Grace" with her tow to avoid the collision.

R. Logson, the mate of the "Grace," testified that at the time of the collision he was in the pilot-house fixing a bell-rope which had parted; he had got half a hitch in the wire when the pilot blew the whistle; he put another hitch in, reached the bell-rope to the pilot and told him he had better stop her; the work witness was then engaged in was his proper work.

On cross-examination, he said he was the officer on watch; when the pilot told him the bell-rope was broken, he went into the pilot-house; he went downstairs to get a new piece of rope, and tied the new piece in; there was no time lost in ringing the bell of which the rope was broken.

The 47th sect. of the Act of Congress of 28th February 1871 (United States Statutes at Large, vol. 16, page 454), enacts as follows :—

"And upon each and every coal-boat, trading-boat, produce-boat, canal-boat, oyster-boat, fishing-boat, raft or other water-craft, navigating any bay, harbor or river, by hand-power, horse-power, sail, or by the current of the river, or which shall be anchored or moored in or near the channel, or fairway, of any bay, harbor or river, there shall be carried from sunset to sunrise one or more good white lights, which shall be placed in such manner as shall be prescribed by the board of supervising inspectors."

The court charged :—

* * * "The plaintiff seeks to recover the value of his barge and coal sunk, and damages for injury to the other two barges. He asserts that the collision was caused wholly by the negligence of those in charge of the tow-boat. The defendants, the owners of the tow-boat, reply that the collision was caused in whole, or in part at least, by the negligence of the plaintiff and his men in charge of the barges. If the allegation of the plaintiff is true, he is entitled to recover; if the allegation of the defendants is true, he is not. The plaintiff alleges that he had proper and sufficient lights on his barges, placed there long enough before the collision, and kept burning, to give the defendants due warning

[Bigley *v.* Williams.]

and enable them to turn out or go around the barges. These allegations the plaintiff is bound to establish by satisfactory evidence. On the other hand, the defendants deny that the plaintiff had proper and sufficient lights, and in consequence of his neglect in this respect the accident happened. This is the main question in the case. As the counsel have very fully discussed the evidence on this point I shall not review it at length, but content myself with stating the principles of law involved in the case and answering the points presented.

"Floating craft, like coal barges, which are very difficult of management, and propelled mainly by the current, are entitled, as a general rule, to the channel; and it is the duty of a steamer to keep out of their way and avoid a collision. But it is the duty of those floating the barges to use care and caution, and in the night-time to have proper signal lights, " one or more good white lights," as required by the Act of Congress, so placed as to give due notice to an approaching steamer. The lights should be of a character to be seen distinctly, to give the approaching steamer fair notice of the location and size of the floating craft, and should be elevated in time to enable the steamer, without haste or confusion, but deliberately, to choose its course, in order to avoid collision.

"Even if the defendants were guilty of negligence, that alone is not sufficient to enable the plaintiff to recover. He must have done all that was required of him, and not have been guilty of any negligence, or neglect of duty, which contributed to the disaster. [Even if defendants' pilot was utterly unfit (although the testimony will probably satisfy you that he was competent), yet that would not justify your verdict for the plaintiff if he had also been guilty of some negligence in the matter; for instance, in not having proper lights or putting them up in proper time.] And the question is not, was it possible for the pilot, after he saw the lights, to avoid a collision? Even if you believe that the mate might have avoided the collision if he had seen the light a few moments sooner, that of itself is not sufficient to enable the plaintiff to recover. His skirts must be clear of all negligence on his part. It was his duty to put up such lights and in such manner and time—not merely to make it possible for the steamer to avoid a collision—but to give the officers of the steamer ample time to determine their course and act deliberately in all they did. It was not sufficient to bring out his lights when he saw and apprehended danger—only some three minutes before the collision. They should have been out before that—before any danger was seen or apprehended."

The plaintiff's third point and answer were:—

3. If the jury believe defendants' mate, to wit, that the bell-

[Bigley *v.* Williams.]

rope broke, then that fact alone is evidence of negligence on the part of the defendants in not having sufficient machinery.

Answer. "This point is too broad, and is therefore refused. But if the breaking of the bell-rope was the cause of the accident, either directly or indirectly, it would be negligence."

The following were defendants' points :—

1. It was the duty of the plaintiff to carry on his floating boats at night one or more fixed and steady lights, and his failure to do so was negligence.

2. The plaintiff was guilty of such negligence in not carrying proper lights on his floating boats, and he is not entitled to recover.

If the court refuse the second point, then the court is requested to charge the jury :—

3. As the plaintiff's boats at the time of the collision were not carrying any fixed and proper signal-lights, the presumption is that his boats were the wrongdoer, and responsible for the collision.

4. Even if the jury find that there was negligence in navigating and handling the defendants' tow-boat which led to the collision, yet if the jury also find that the plaintiff was also guilty of negligence in not having proper signal lights on his floating boats, and that such negligence of the plaintiff contributed to the collision, the plaintiff cannot recover, and the verdict should be for the defendants.

The answer to defendants' points was :—

"The 1st, 2d and 3d points seem to be based on the theory that it was the duty of the plaintiff to have fixed and constant lights burning from sunset to sunrise under the Act of Congress. But we have no evidence that the proper authorities mentioned in the act have established any rules on the subject of floating crafts like these coal barges. Under this act it was the duty of the plaintiff to carry 'one or more good white lights,' but the supervising inspectors have adopted no rules prescribing the place or manner in which they shall be placed, and until such regulations be made, it is sufficient if the plaintiff placed his lights in such manner as had been the usual and ordinary custom for many years. It does not matter what negligence the plaintiff may have been guilty of at other times and places.

"The question is, was he guilty of any negligence at the time and place of this accident? It is in evidence that floating coal barges on the Ohio have never adopted fixed lights, and that no rules have been adopted requiring or regulating them. I therefore charge you that if the plaintiff had on his barges such lights as I have described in the general charge, they were sufficient. For these reasons the first three points are refused. I will add, that the cooking fire in the shanty was not such a light as is required

[Bigley *v.* Williams.]

by the Act of Congress. It was his duty to provide lights especially for the purpose."

The verdict was for the plaintiff for $2106.24.

The defendants moved for a new trial. On the 25th of February 1875 the court ordered that the motion for a new trial be granted, unless the plaintiff filed a stipulation reducing the verdict to $1500. The plaintiff filed the stipulation, and March 1st 1875 judgment was entered on the verdict for the plaintiff for $1500.

The defendants took a writ of error, which was filed in the court below March 9th 1875. On the 2d of April 1875, the plaintiff obtained a rule on the defendants, to show cause why plaintiff should not have leave to withdraw his stipulation, &c., and the judgment be corrected by entering judgment for the plaintiff on the verdict. On the 28th of June the plaintiff had leave to withdraw his stipulation, the order of February 25th was revoked, the new trial refused and judgment was entered on the verdict for the amount found by it.

In making this order, Judge White delivered the following opinion:—

"When the order of court was made, reducing the verdict from $2106.24 to $1500, it was the understanding of the court, that, if the plaintiff filed a stipulation accepting that sum, it would be satisfactory to defendants, and end the case. But after the stipulation was filed and judgment entered for the $1500, the defendants sued out their writ of error. If we had supposed the defendants would not accept that order of the court as a finality, or intended to take a writ of error, we should not have interfered with the verdict, and should have refused absolutely to grant a new trial. If the plaintiff must follow the case to the Supreme Court and be subject to further delay and further litigation on the legal questions, he ought to have the chance of getting the whole amount of the verdict. The question of damage was fairly submitted to the jury, and the amount they gave was not beyond the plaintiff's evidence.

"Whether we have the power, in the present state of the case, to interfere with the record may be doubtful. But we think we have. The record is not yet made up, nor has it been certified, but it is still in our custody and we think under our control, in all matters not affecting the writ of error. It is therefore now ordered, to wit, June 28th 1875, that the plaintiff have leave to withdraw his stipulation consenting to take $1500; that the order of court of February 25th 1875, be hereby revoked; that the new trial be refused, and that judgment be entered on the verdict for the amount thereof." * * *

The defendants assigned for error:—

1, 2. Admitting the testimony of McDonald and Bobo.

3. The part of the charge in brackets.

30 P. F. Smith—8

4. Admitting the part of the testimony of the plaintiff which was objected to.

5. Admitting the testimony of N. W. Aultman.

6, 7, 8. The answer to the defendants' points.

9. The answer to the plaintiff's third point.

10. Making the order of June 28th 1875.

*M. W. Acheson*, for plaintiffs in error.—The general character of Marshall, the pilot, was not involved; evidence on that subject should not have been received: 1 Greenl. Ev., sect. 54; Mertz *v.* Detweiler, 8 W. & S. 376. The declarations of the pilot were not evidence: Fawcett *v.* Bigley, 9 P. F. Smith 411. It was the duty of the float to have had signal-lights: Delaware *v.* Steamer Osprey, 2 Wall., Jr., 168; Nelson *v.* Leland, 22 How. 48; Act of Congress, February 28th 1871, *supra.* The court could not declare that the breaking of the bell-rope was negligence; it was for the jury: Railway *v.* Hassard, 25 P. F. Smith 367. The defendants should not have been held liable for an accident to which the most prudent are subject: Shearman & Redfield on Negligence, sect. 6; Meier *v.* Penna. Railroad Co., 14 P. F. Smith 225; Brown *v.* Clegg, 13 Id. 51; Story on Bailments, sect. 496. The writ of error issued before the revocation of the order, February 25th 1875, ousted the jurisdiction of the court below: Stephens *v.* Cowen, 6 Watts 511; Ullery *v.* Clark, 6 Harris 148; Mathers *v.* Patterson, 9 Casey 485; King *v.* Brooks, 22 P. F. Smith 363.

*W. Owens, Jr.*, and *J. Barton*, for defendant in error.—The evidence in the first and second errors was not to show the reputation of the pilot, but to show that he was in fact incapacitated; it was the duty of the defendants to adopt measures to avoid collision: Pearce *v.* Page, 24 Howard 228. The general usage of a river in regard to navigating ascending and descending boats should be followed: Haldeman *v.* Beckwith, 4 McLean 286; Barrett *v.* Williamson, Id. 589; The Major Barbour *v.* The Paul Jones, 13 Id. 101. Omitting to keep a sufficient lookout, as matter of law, is gross negligence: The Northern Indiana, 3 Bl. C. C. 92; The James Adger, Id. 515; Buzzard *v.* Petrel, 6 McLean 491.

Mr. Justice GORDON delivered the opinion of the court, June 9th 1876.

This was an action on the case, brought by the plaintiff against the defendants, for damages resulting from the sinking of one of his barges, laden with coal, by a collision with their steamer, R. J. Grace, whilst navigating the Ohio river. It was alleged that this loss happened through the negligence of the defendants' employees who had charge of their boat. This was the issue; it was one of fact, and any evidence which tended to establish negli-

[Bigley v. Williams.]

gence, on part of those navigating the steamer, or their incompetency in the discharge of the duties which devolved upon them, and which would tend, though remotely, to produce the catastrophe complained of, was relevant and pertinent to the issue trying. The plaintiff's barges were floating down the river, propelled by the current, and directed only by oars. The steamboat was ascending, driven by steam, and fully under the control of its pilot; hence, it was bound, by every law of navigation, to keep clear of the barges. Obviously, then, a collision happening, under such circumstances, the boat would be primâ facie in fault. It follows, that the plaintiff might have rested upon showing the collision and loss, with the additional evidence, made necessary by the fact that the accident happened at night, that the precaution required by the Act of Congress, as well as by common prudence, to wit, the exhibition of such light or lights as were necessary to warn the steamer of the position of the barges, had been complied with. If, however, the plaintiff chose to go a step further and show that the boat was improperly manned, he might without error do so. It was at best but anticipating the defence by introducing, out of order, his rebutting evidence. It was certainly competent for the defendants to attempt to show, as they did, that the pilot was careful and skilful, for, thereby, the probabilities of negligence would be greatly reduced, but in such case it would not be controverted that the plaintiff might rebut by proving the incompetency of that officer. Independently of this, the plaintiff was not bound to rest his case upon the presumption of carelessness arising from circumstances, but might prove positive negligence, and we certainly think that proof of want of skill, in so important an officer as the pilot, was at least one step in that direction. We, therefore, refuse to sustain the first and second assignments of error. The sixth, seventh and eighth relate to one point, to wit, the contributory negligence of the plaintiff in not carrying upon his barges, during the night, one or more fixed lights. This question was properly submitted to the jury. The learned judge who tried the case says: " His (the plaintiff's) skirts must be clear of all negligence on his part. It was his duty to put up such lights, and in such manner and time— not merely to make it *possible* for the steamer to avoid a collision— but, to give the officers ample time to determine their course, and act deliberately in all they did. It was not sufficient to bring out his lights when he saw and apprehended danger—only some three minutes before the collision. They should have been out before that; before any danger was seen or apprehended." We cannot see how the defendants could require a direction more favorable. The duty of the plaintiff was to show a light when it would avail the pilot and crew of the steamboat to avoid a collision with the barges, and that that duty was neglected during the remainder of

[Bigley *v.* Williams.]

the night, when the steamer was not in sight, was of no importance whatever to the defendants.

The fourth assignment must be sustained. The fact of the suicide of the pilot, within twenty-four hours, or at any other time, after the accident, was so clearly not evidence that argument upon this point is not necessary. The only use that could be made of such testimony would be to damage the defendants' case by raising a presumption of negligence in the pilot, from his own appalling and atrocious act, for which the defendants were not in the slightest degree responsible. This matter should not have appeared in the case. So, the declarations of Marshall, unless made before or at the time of the collision and "so connected with it as to make then part of the *res gestæ*," ought not to have been admitted. As was said by Mr. Justice AGNEW in Fawcett *v.* Bigley, 9 P. F. Smith 411: "The narrative of an agent of a past occurrence cannot be received as proof, against the principal, of the existence of such occurrence." The offer, in the case cited, was to prove the declarations of the defendant's agent within one hour after the accident, but it was rejected, and, as we have seen, that rejection was sustained by this court. We find, therefore, that the nearness of the subsequent declarations of an agent to the accident, does not qualify them as evidence unless such declarations are so immediately connected with it as necessarily to form part of its history. The ninth assignment is not sustained. The court well answer the point in saying, that the breaking of the bell-rope would not be evidence of negligence unless it, in some degree, contributed to the accident.

The reversal of the judgment makes an examination of the tenth specification unnecessary.

Judgment is reversed, and a *venire facias de novo* awarded.